# TEXAS AND PACIFIC RAILWAY COMPANY
## *v.* REEDER.

### ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 203.   Submitted April 15, 1898 — Decided May 9, 1898.

A provision in a contract, made with a railroad company for the carriage of live stock, that the person in charge of the stock shall remain in the caboose car while the train is in motion, is not violated by his being in the car with the live stock when the train is not in motion, even though he may have been in that car instead of in the caboose car when the train was in motion; and in case of an accident happening to him, while so in the cattle car, caused by a sudden jerk made when the train was at rest, his being in the cattle car at that time, and under such circumstances, does not make him guilty of contributory negligence.

· This was an action originally instituted by Alexander Reeder against the Texas and Pacific Railway Company in the District Court of Marion County, Texas, to recover for personal injuries sustained by Reeder. The action was afterwards removed upon petition of the defendant to the United

States Circuit Court for the Eastern District of Texas.   The facts of the case were substantially as follows:

Reeder shipped from Scottsville, Kansas, to Houston, Texas, a car loaded with an emigrant outfit, consisting of ten head of live stock and of household goods, and accompanied the same upon a drover's pass.   It was provided in the contract which he entered into with the railway company, that he should "assume all risk and expense of feeding, watering, bedding and otherwise caring for the live stock" while on the way, and to better care for the stock he rode in the car with them.   In the ninth paragraph of the contract it was further provided "that the person or persons in charge of live stock covered by this contract shall remain in the caboose car attached to the train while the same is in motion, and that whenever such person or persons shall leave the caboose, or pass over or along the cars or track, they shall do so at their own risk of personal injury from every cause whatever."

The evidence shows that it was the custom on the road of the defendant company for stockmen to ride in the caboose, but that in a case of an "emigrant outfit," like the one in question, it was not unusual for the person in charge to ride in the car with the live stock.   Reeder rode with the live stock during the whole trip, and although his car was next to the caboose, and he was invited by the conductor and trainmen to ride in the caboose, he declined for the reason that it would be inconvenient for him to get in and out of the car to look after his stock.

Reeder, whose age was about seventy, testified that he had travelled about five hundred miles over connecting lines before reaching the line of the defendant company, and in that distance neither his stock nor himself had sustained any injury.   He further testified that during his whole trip on the line of the defendant his stock was roughly handled by the sudden stopping and starting of the engine, and had been knocked down at least eight times, and that his complaints to the trainmen that the jerks and jolts were killing his stock did no good.   He also testified that at or about the place along the line of the road where he received his injury, called

Longview, the train was stalled on a steep grade, and the engineer in trying to get headway would back the train a short distance and then start with a sudden jerk as he took up the slack of the train; that one of the jerks threw down three cows and two horses, whose halters had been snapped by the jerk; that the engineer uncoupled the train, taking part up the grade, leaving his car; that after the car stopped he got the stock up and was on his way back to his seat when the engine came back against the train with such a sudden jar that he was thrown off his feet, and to save himself he grabbed an iron support. It seems that the sudden jar or jerk pulled his right arm out of joint at the shoulder, which subsequently was followed by a partial paralysis of the shoulder muscles.

. The engineer and others of the train crew testified that the train was not uncoupled at the place mentioned by Reeder, but was uncoupled at another place called Marshall, where there was a very steep grade. The witnesses for the defendant also testified that the trip was no rougher than usual, and one of the brakemen said on the stand that he was riding in the caboose at the time of the jerk which caused the injury, and that he did not suffer from it in any way.

After all the evidence was in, the defendant requested the court to charge the jury to return a verdict for the defendant. This the court refused to do, whereupon the defendant requested the court to charge the jury to find for the defendant in case it should find from the evidence that the plaintiff would not have been injured if he had been in the caboose instead of the stock car; that he was invited to ride in the caboose; that the latter was a safer place than the stock car, and that the plaintiff knew it. The court refused to grant any of the instructions requested by the defendant, and charged the jury as follows:

"If you believe from the evidence that the plaintiff, Alexander Reeder, was riding in the stock car in which his horses and cattle and goods were being transported over the defendant's road, and that while the train was stationary, his cattle being down, and needed his attention, he at the time, in a

prudent and careful manner, attempted or did give the horses and cattle the attention or assistance which they needed, and that the plaintiff was injured at that time, by a sudden and unusual hard jerk or jolt or bumping of the cars in which he was riding, through and by the negligence of the defendant company or its operatives; you will find for the plaintiff, and assess actual damages as hereinafter instructed.

"If, however, you believe from the evidence, that at the time the plaintiff was hurt, that the train upon which he was riding was in motion, at the time he was giving the horses and cattle the assistance which they needed, the plaintiff would not be entitled to recover, and you will find for the defendant."

The jury returned a verdict for the plaintiff in the sum of $1500, upon which judgment was entered. The case was then taken to the Court of Appeals for the Fifth Circuit, 41 U. S. App. 775, where the judgment below was affirmed, and the case is now before this court on writ of error.

*Mr. John F. Dillon, Mr. Winslow S. Pierce* and *Mr. David D. Duncan* for plaintiff in error.

*Mr. Presley K. Ewing, Mr. Henry F. Ring* and *Mr. L. S. Schluter* for defendant in error.

Mr. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The several assignments of error in this case all resolve themselves into the two questions whether the defendant railway company was entitled to a peremptory instruction in its favor, or, in case of a refusal of such instruction, whether it was entitled to submit to the jury the question of the contributory negligence of the plaintiff in the mere fact of riding in the stock car.

In this connection defendant relies upon the ninth clause of the contract under which plaintiff was travelling and transporting his stock, which provided that "the person or persons

in charge of live stock covered by this contract shall remain in the caboose car attached to the train while the same is in motion." This clause was undoubtedly intended to provide a safe place for drovers in attendance upon their stock, although in the case of emigrants accompanying their outfits it was a common custom to permit them to ride in the car with their outfits. But, assuming that the plaintiff was bound by this stipulation, it was manifestly obligatory upon him only while the car was in motion, the design evidently being that drovers should be permitted to visit their stock cars and see to their cattle while the train was at rest. Indeed, the contract specially provided that the plaintiff should "assume all risk and expense of feeding, watering, bedding and otherwise caring for the live stock provided for by this contract, while in yards, pens or elsewhere." The stipulation was doubtless primarily intended to permit drovers to visit their stock cars while the train was stopping at its regular stations, but as there is no such limitation in the contract, we think the plaintiff was not guilty of contributory negligence in attending to his cattle whenever the train was not in motion, whatever may have been the cause of its stoppage, and whether the same occurred at a station or not. The company might doubtless have restricted the right of its drovers to visit their stock while the train was stopping at its regular stations, but it did not choose to do so, and there evidently was as much necessity in the present case for the plaintiff to care for his stock and to protect it against injury as there would have been if the train had been stopping at such a station.

If the plaintiff, while riding in a caboose, might, within the terms of the contract, have been visiting his cattle at the time the accident occurred, then the fact that he was actually riding in the same car with them while the car was in motion becomes immaterial, since the propriety of his action in being in the stock car must be gauged by the fact whether the train was in motion or not. Had the accident occurred while the plaintiff should have been riding in the caboose, that is, while the train was in motion, it would have been strong, if not conclusive, evidence of contributory negligence on his part.

What then is meant by the train being "in motion"? The jar or sudden jolt which occasioned the injury doubtless presupposes a momentary motion of the car, but that is an extremely limited sense of the word, and one inconsistent with the obvious purpose of the license, since, while stopping at a regular station, freight trains are frequently subject to be moved short distances in order to drop off or take on cars, to be switched on side tracks in order to accommodate passenger trains, or to take on fuel or water. If cars were held to be in motion while making these trifling changes, the privilege of entering a stock car while the train was at rest would be of no practical value. The more reasonable interpretation is that by the word "motion," as here used, is intended that continuous movement of the cars towards their destination which is commonly understood when we speak of moving trains or trains in motion. Whether the train was really in motion was a question which was submitted to the jury, and we have no criticism to make of the instruction of the court in that particular: "That if you believe from the evidence that the plaintiff, Alexander Reeder, was riding in the stock car in which his horses and cattle and goods were being transported over defendant's road, and that while the train was stationary, his cattle being down, and needed his attention, he at the time, in a prudent and careful manner, attempted to or did give the horses and cattle the attention or assistance which they needed, and that the plaintiff was injured at that time by a sudden and unusual hard jerk or jolt or bumping of the cars in which he was riding, through and by the negligence of the defendant company or its operatives, you will find for the plaintiff, and assess actual damages as hereinafter instructed."

Evidently the action of the plaintiff upon the occasion in question was entitled to some liberality of construction and was dictated by a manifest prudence for the care of his stock. In his deposition he states:

"My car was next to the caboose and received the full force of the jerk and threw several of my cows down and the horses on top of them; the jar broke the halters that held the horses;

I saw they were being killed by the repeated jerks and I climbed in the trough (I was afraid to get in where they were in any other way) and held on to the side of the car; while in that position they uncoupled the train and took a part of it up the grade, leaving my car stationary for a time; I then managed to get the stock all up and was still holding on to the side of the car and up in the feed trough, when the engine came back against the train without my knowing that it was coming with such force as to throw me out of the trough, but I held on to the side of the car, knowing that if I got under my stock I would be killed. The car jerked my arm out of place in the shoulder joint. Soon afterwards I called the conductor and he came to my assistance. . . . The engine came back against the car with great force and then plunged forward taking up the slack, and jerked the car I was in with such force as to hurt me, as already stated. I was up in the feed trough and was just going to get down when the jerk came, and was entirely unexpected to me."

When on the stand the plaintiff testified:

" Just before I was injured the jar knocked three cows down, and two of the horses fell on top of them, and when the car stopped I got down in front to get them up again, and after I got them up I was going back to take the seat again, and when I was about a foot from the end a jar came and knocked me off my feet, and I grabbed hold of some iron, and that swung me back this way until they got started all right, and after they got started on the run, and then I got down and got on my feet again; as soon as they stopped again I called to the conductor and brakemen."

The truth seems to be that the train was not provided with sufficient traction power, and that a stronger or additional locomotive should have been employed. If the train was not in motion when the accident occurred, we think that, in view of the obviously negligent conduct of the defendant, motives of humanity as well as of prudence may have required of the plaintiff more than ordinary care in looking after and protecting his stock.

The company was evidently not entitled to an instruction

that plaintiff, by riding in the stock car while the train was in motion, was guilty of contributory negligence, or even to go to the jury on that point. The real question was whether the train was actually in motion when the injury was received, and, if there was any error at all in submitting that question to the jury, it was not one of which the defendant was entitled to complain.

There was no error in the action of the Court of Appeals, and its judgment is, therefore,

*Affirmed.*

Mr. Justice White dissented.